Thank you, Your Honor, and may it please the Court, Counsel, if I may, I'd like to reserve five minutes of my time for rebuttal. The key principle, legal principle, of Louisiana prescription law that governs this case was explained by the Fifth Circuit in Bruno v. Biomet, which itself cited the Louisiana Supreme Court's binding decision in Jordan v. Employee Transfer Corporation to explain that, quote, when a plaintiff acts reasonably to discover the cause of a problem, the prescriptive period does not begin to run until he has a reasonable basis to pursue a claim against a specific defendant. Thus, for prescription to run on Plaintiff Jones and Pelican's claims, they needed to know, or reasonably should have known, three distinct elements, first, that a defendant, in this case 3M, had acted tortiously against them through the use of its defective bear hugger device being applied to them during their surgeries, second, that they were injured, and third, of a causal link between defendant's conscious actions and their injury. That's the formulation from the Ducre, the Fifth Circuit in Ducre at 963 F. 2nd at 760. Prescription does not begin to run from the earliest possible indication that something might be wrong, as the Louisiana Supreme Court said in Jordan, nor does constructive notice begin to be applied from the mere apprehension that a plaintiff has suffered a wrong, as the Louisiana Supreme Court said in the Griffin decision. But that is precisely what the district court held here when the court concluded that at the time of their infections, plaintiff's prescription period started, because at that time they could have requested medical records. Because that decision flatly contradicts binding Louisiana law, and because plaintiffs acted reasonably at all times. Well, I could be wrong, but I don't think that's what the district court did at all. I don't think it started the date from when the infection occurred. I mean, for instance, on Pelican, Pelican seems kind of easy. It was on a list of undisclosed cases more than a year before the case was filed. That seems like a slam dunk. Well, I'll take that in turn, Your Honor. It's not a slam dunk, the list of unfiled cases, because the list of unfiled cases does not show that plaintiff Pelican knew or reasonably should have known. Well, his lawyer did put it on a list of unfiled cases. That's not true, Your Honor. The unfiled cases claim was put in pursuant to the order of the court, which, as is conceded by defendants here, was an order that required plaintiffs to disclose all parties who had contacted counsel regarding the Bearhugger litigation at all. It didn't say that they had knowledge that Bearhugger had actually been used. It didn't say that they had knowledge of causation. It would simply tell us every person, and we're going to call this an unfiled claim, quote, unquote, every person who's contacted your firm. Louisiana law does not say when you contact a law firm about a possible claim, and when the law firm then starts to reasonably investigate whether you have a claim by trying to see that the product was actually used and a tort was actually committed against you, that that starts your prescription period. Rather, you have to do a reasonable investigation. The period starts when you either know or reasonably should know. And with respect to the first part of Your Honor's question. So your position is that contacting the firm is not evidence that they knew or should have known that they had a claim? It's certainly evidence that they knew they had an injury. They knew they had an injury from the time that they received infections from the defective, from the use of the defective Bearhugger device during their first surgeries. But again, there's three distinct elements that they need to know or reasonably know. One of them is injury. But the other is that a defendant, a specific defendant has acted tortiously against them. And they did not know that. It's undisputed on this record that they had no knowledge that the Bearhugger was used during their surgeries. That's because of the unique facts of this case. Undisputed? Yes, Your Honor. The undisputed record, well, I should say the summary judgment record read in the light most favorable to plaintiffs makes clear. Well, there's a bit of a difference there. Well, it's, well, I should say it is actually undisputed that at the time of the surgeries they did not know. Even defendants recognized the only way they could have learned would be to review the medical records. The only dispute comes in is when they reviewed the medical records. Plaintiff defendants wrongly take the facts that they're in the light most favorable to them and say that they were actually reviewed earlier than they were. The amended fact sheets make clear that the first time plaintiffs were able to obtain and actually review medical records was for Plaintiff Pelican within a year of his filing on August 24th of 2022 before he filed on June 16th of 2023. For the first part of Judge Render's question, I respectfully disagree. The district court said in its sort of key decreed language that the plaintiffs could have ordered their medical records at any time after they had an infection. And I believe that that's when they started, when the district court started the clock because of a theory that if you were able to obtain the medical records or request the medical records, whether or not it was reasonable for you to do so, whether or not you knew that Bearhugger was used. Indeed, on this record, both Pelican and Jones had no knowledge that Bearhugger even existed, let alone that it was used during their surgeries, let alone that it could potentially cause injuries. So the district court's decision to essentially, I mean, the district court credited plaintiffs' amended fact sheets and said, I'll take it as given that they actually didn't review them until within a year of their filing, but it doesn't matter because they could have reviewed them sooner. But that decision contradicts multiple decisions of the Louisiana Supreme Court that make clear that the actual test for when prescription begins to run is whether a plaintiff behaves reasonably. The key case here is the Jordan case of the Louisiana Supreme Court. And I'd like to talk very briefly about the facts of that case. It was a case about leaky foundations in a house. And the plaintiffs purchased the house in August of 1981. And at the time they purchased, there was a report given to them that showed the foundations were great. Defendants had a separate, the realty company had a separate report that showed the foundations were actually faulty and would cost thousands of dollars. In October of 1981, there was heavy rains and it flooded the den of the house. At that time, they brought in a contractor who said, there's moldy sideboards here. This den has flooded before. So in October of 1981, they knew that they had been injured by flooding and that there had not been disclosure of previous flooding by the sellers. Nonetheless, they said, the contractor said, I think it … Under Minnesota law, as a judge, I've tried one of these ground leaking cases. They could not be less analogous to this situation, in my view. Fair enough, Your Honor. I'll skip ahead, but I simply want to say that there was, that they acted reasonably and repaired a ceiling that they thought, or the chimney that they thought was the problem. The house then flooded again in December of 1981. And at that point in time, the homeowners went and got a second report that was always at the realty company, that was always accessible, the one that had not been disclosed to them previously. They learned then that it was actually the foundations that were the problem, and they filed within a year in December of 1982. So they did not file within a year of learning that they had an injury. They filed within a year of getting the report, or what's the equivalent of the medical records in this case. And the Louisiana Supreme Court said that was reasonable for them to do, because at the time of the initial flooding, they had no way to know that it was actually the foundations. But didn't one, at least one, or maybe both of these plaintiffs see, I think, your firm's advertisement that linked Bear Huggers to this problem more than a year before it was filed? Yes, Your Honor. The Plaintiff Jones saw a commercial that didn't specifically mention Bear Huggers, but talked about the possibility of forced air warming devices causing infections. From the time of seeing that and learning of a possible connection, which would give Plaintiff Jones the possible causal connection, they still needed to do an investigation to confirm that Bear Hugger was, in fact, used against Plaintiff Jones. And at that time, a plaintiff's, the testimony for both Plaintiff Jones and Pelican is that they at all times acted reasonably. Upon seeing that commercial, Plaintiff Jones retained the law firm to pick up the investigation. That's at the record at Appendix 199 and Appendix 217. When did you retain McDonnell Worley? Answer, when I saw the commercial. So immediately upon seeing the commercial, counsel was hired. Now, counsel being hired does not start the running of the clock. It doesn't begin to run when you hire counsel. It begins to run when you have It depends who the lawyer is and the circumstances. It's fact and tense. That's exactly right, Your Honor. It's fact and tense. Then the facts couldn't be worse for you here. Perspectively, I disagree, Your Honor. Counsel But your firm or somebody, that lawyer had been doing it for ten years. Yes, but On a class action basis. There's, there's no, it's no simple matter to obtain medical records that confirm product ID. To this day, defendants are unable, in responding to a request for admission, are unable to admit or deny whether Bear Hugger was used in these two plaintiff's cases. Yet they say, oh, we've always known that they were used. That's not true. In order to confirm Do we have medical records that say that Bear Hugger was used? I apologize, Your Honor. Say again? Are there medical records that say Bear Hugger was used in these two cases? Yes, there are, Your Honor. And those are the records that were reviewed at the time and stated in the plaintiff's fact sheets for the first time. That record was reviewed by Plaintiff Pelican. So as you do, are you proposing a bright line rule that you have to actually see the medical records before you have enough information to file the claim? No, you have to have, it's Louisiana law that you have to have, you have to know or reasonably should know that a tort was committed against you is the rule. That's the Jordan courts and Kinsberger and many other, Griffin against Kinsberger and many others. Let me ask you about Jones then. It looked like there was a print date for some of the medical records well over, well, just over a year before the complaint filed. Is that, does that preclude Jones' claim? It does not, Your Honor. If you review those medical records that have those print dates, they do not disclose that Bearhugger was used during Jones' initial December 17th of 2020 surgery. What records do show that? Where are those in the, in the, this record? For Mr. Pelican, that record is at Appendix 2566. For Mr. Jones, there's just a plaintiff's amended fact sheet that says that the record was first reviewed. So there's no medical record for Mr. Jones indicating that Bearhugger was used? There is, Your Honor, but unfortunately it's not in the record. But nonetheless, that record was reviewed and the court should credit the evidence in the fact sheet that says it was first reviewed and that was first disclosed on February 15th of 2024. Last thing I just want to say is that obtaining medical records is not a simple matter. The district court wrongly concluded that requesting them means you obtain them. From the time counsel was, from the time counsel was retained, they worked diligently to obtain the medical records. To the extent the court has questions about it or defendants have questions about it, that's a prototypical fact dispute about whether they should have ordered them earlier or reviewed them earlier. But the record evidence is that they ordered them and the first date they were able to obtain them are stated in the amended fact sheets and was within time of filing. I'll reserve the remainder of my time for rebuttal. Mr. Jessman? Thank you, Your Honors, and good morning. May it please the court and counsel. This court should affirm the district court's granted summary judgment because more than one year before each of these plaintiffs filed the lawsuits, they were on actual and constructive notice of their injuries when they were alerted to the link, the alleged link, between the bear hugger system and their infections. One through a TV commercial, as Judge Grunder alluded to, and one through internet research and a Facebook friend telling me there's something wrong, that's appendix page 1139. And then that led them to hire lawyers, not only random lawyers, but these lawyers who, as the court mentioned a moment ago, have been involved in the bear hugger litigation for over 10 years, five years at the time. And of course, the lawyer's knowledge is imputed to their client under Louisiana law. We cite cases for that in our brief. I'd like to respond to, I think, three points that came up during my colleague's opening remarks. First was the concept that counsel being hired doesn't start the clock. That's what I understood the argument to be. And that's squarely wrong under Louisiana law. Hiring an attorney starts the clock, plaintiff's awareness of an injury as a matter of law. That's the Clover case, among others. Does plaintiff also have to be aware, though, of the cause of the injury? There are cases that says you need to be either on actual or inquiry notice of a potential cause or a possible root cause. Language like that. That's in the Taxotere case, for example, where the Fifth Circuit still affirms summary judgment on this type of prescription issue. So to have prescription here, would we need to know when they actually found out that bear hugger was actually used in their surgery? So let me answer that in two ways. One is legal and one is factual. So for Mr. Jones, he says enough to say he was on inquiry notice of this causation point. So at page 199 of the appendix, he was asked, why did you sue 3M? And his answer was he saw a TV commercial a few years before his deposition about the bear hug blanket or whatever may cause the injuries. It'll cause infections and things. So that was a few years before his deposition. The deposition was in May of 2024. So at the closest, that would be of 2021. But that doesn't establish that he knew bear hugger was used, right? He doesn't need to know specifically the bear hugger was used. And that leads me to another point. I think my colleague was saying you need sort of evidentiary confirmation. And that's not the law either. Both Taxotere says that and the Fifth Circuit's case in Allied World says that's not the level of certitude you need. You just need to have enough knowledge to excite your attention and put you on guard to call for an inquiry. That's what the Louisiana cases say. And to answer Judge Kelly's question about medical records, the medical records here were printed both for Jones and Pelican before or over one year before they each filed their lawsuits. But I think as to Jones, there isn't any reference to even a forced air device, is there? I think there's references to like 3M drape and other things like that. That's at page 2150 of the appendix. It doesn't say bear hugger system. It doesn't say... Or it doesn't say forced. It's a forced air system. Correct. And in our view, that is a failure of proof on the plaintiff's part. And what's really important as a legal principle is because the plaintiff is seeking to invoke contra non volentum, this exception to prescription, it's their burden to establish that they were reasonable and that they did all the things. Well, why wouldn't it be reasonable to ask for your medical records and then find nothing in there that said there was even a forced air device being used? Oh, we of course think it's reasonable for a plaintiff to ask a doctor what happened than to ask for medical records. What the record shows is that Plaintiff Jones talked about the infection with a lawyer on the phone on August 18th of 2021. That's appendix page 1885. And when you have a lawyer on the phone... Isn't that making a lot of inferences though about just a lawyer on the phone? And maybe I've overlooked something in the record, but what else do we know about that telephone call other than there was a lawyer on the phone?  So we know there was a lawyer on the phone. We don't know which lawyer it was. We don't know what advice they gave. Obviously, that would have been... Do we even know the topic of the conversation? We know that they were talking about the infection. We don't know what legal advice was being sought or rendered. And I'm guessing that would have been objected to as privileged. But what the Louisiana courts say is when you get a lawyer involved, that has to start the clock. Can I ask you about your... You said that Jones said he saw the commercials a few years prior to deposition. And I think you said, well, that's then at least 21. How do we define a few? It could be two. I don't think the plain understanding of a few is two, right? A few is at least three. In my view, if you want to say a couple, that'd be two or... Do we have a precise definition of a few? We don't have his precise definition. But you can look at the other evidence in the record, right? Of when the medical records were printed. As Your Honor indicated, the medical records for Jones were printed on April 4th of 2022, which is, of course, more than a year before he filed the lawsuit. And that's well after he was on the phone with the attorney in August of 2021. But again, if there's questions about how do we deal with any potential gaps, that's a failure of proof on the plaintiff, because it's their burden to establish the discovery rule exception. And they haven't done that. They haven't even explained, frankly, why they amended their fact sheets. So we agree with the district court. This court doesn't need to address the sham affidavit. The court can say all of the factors the district court looked at, TV advertisements, print dates for medical records, you know, doing internet research and consulting an attorney. That's all enough as a matter of law to start the clock. And in both cases, both clocks were started more than a year before they filed their lawsuits. But if you... Do you think that they need to know that it is bear hugger, or do you think a forced air device is sufficient? Yeah, the cases say you don't need that level of evidentiary certitude. You need to know that it's a potential cause or a possible root cause. That language is used in taxatier, for example. The level of evidentiary confirmation that I think the other side is saying would be pretty striking here. Wouldn't that help define the defendant, though? I mean, not in this case, when you hire the lawyer who's been suing the defendant for five years. When you have the firm that's representing you, has been suing the same defendant for many years under Louisiana law, that's well more than sufficient on that. Isn't that also the difference between inquiry notice and actual notice? Yeah, I mean, there's... I think you could say fairly that the plaintiffs here had both actual notice and constructive or inquiry notice or imputation through their attorneys. Certainly, when Jones says, he saw this commercial multiple times a few years before his deposition. It referenced the bear hug blanket or whatever may cause the injuries. That's at appellate page 199 of the appendix. And then he retained McDonald-Worley when I saw the commercial. That's what he testified at page 217 of the appendix. And so when you do that, that's enough to start the clock. I'll also note, I don't understand what the other side's position is on when the clock does start. I think what they're saying is it starts not when they saw the commercial, not when they hired the law firm, not even when they filed the lawsuit, but after they filed the lawsuit, when their attorney finally reviews the medical records. We're not aware of any case under Louisiana law, or frankly, anywhere in the country that says you can file your lawsuit and the clock starts after you file your lawsuit, when you finally have your attorney review the medical records and confirm which device was used. That's quite a striking position in our view. And if you look at most of their cases, most of their cases, including the ones our colleague referenced this morning, they were fighting about earlier time periods, right? When someone may have been exposed to a particular drug or device or agent, but hadn't been diagnosed with something. And all of the cases start the clock, where if this court starts the clock at the same place, their claims are time barred. So receipt of attorney advertisement, being exposed to publicly available information, right? Those types of things. So we're not aware of any case where if you apply the rules that they're applying on these facts that their claims would still be available to them. And just addressing a couple other points, I understood their reply brief to say, you know, this is often a fact question, right? Whether what's reasonable can be a fact question. Certainly in some contexts, that can be true. But the Louisiana Supreme Court has said time and again, this is an exceedingly stringent standard, the discovery rule exception to prescription. It's a high burden. And they have decided as a matter of law, cases on much less favorable facts to plaintiffs. So the Marin case, M-A-R-I-N versus Exxon Mobil. That's a case we said in our brief. And as a good analogous case on involving lawyers, the Louisiana Supreme Court case in Young versus Clement, that's a 1979 case where a plaintiff sued a doctor. And then over a year later, they sued the hospital. And Louisiana Supreme Court said, well, you've had a lawyer involved for over a year. And you didn't sue the hospital. So the claims against the hospital are time barred because you had a lawyer involved for over a year. And if you look at the undisputed facts on this record, the lawyers were involved for over a year in both cases. I also agree with Judge Grander's comment. The Pelican case is particularly easy because the unfiled claims spreadsheet came more than a year before his lawsuit was filed. And your statement about Jones saying lawyers were involved, you're relying on the August 21 phone call? That and his testimony that a few years before his deposition, that was when he saw the commercial about the bear hug blanket or whatever may cause the injuries. And later on, he said that's when he hired his counsel. He was asked, when did you retain your counsel? And he said, when I saw the commercial. So we can presume maybe that first lawyer is someone else. I mean, I think whether it's the same law firm or a different lawyer, the point is the same, right? When you hire a lawyer that shows you're on your guard, that something might have gone wrong and that you're starting to look into things. And then, therefore, under Louisiana law, that starts the clock. And so if you combine the August 2021 lawyer on the phone, the testimony about seeing the commercial sometime in 21, probably before his third surgery, which was in December, and then printing of the medical records, that's well more than sufficient under Louisiana law. So with that, unless the Court has further questions, we'd ask the Court to affirm. Thank you. For Rebuttal. Thank you, Your Honor. When do plaintiffs contend the clock started? The clock starts when they know or reasonably should have known that the bear hugger was used against them. So in this, on the facts of this case, on the facts of this case, it started. So we got to have a trial for that or what? I don't understand your position in the brief. The facts, in order to know that they were acted tortiously, that there was a tortious act against them, they needed to either know or reasonably should know that the bear hugger was used. That's the triggering fact. That's not a made-up rule. That's straight from the Louisiana Supreme Court. They have to know they have a claim against a specific defendant. That's in the Jordan case. Is your position that that didn't happen until after the claim was, after these suits were filed? Yes. In the case of Mr. Jones, that's correct. In the case of Mr. Jones, they were not able to confirm the use of bear hugger through the medical records because they were still not able to get them. So they filed. Any case that you can cite that said that that's when the clock starts after a lawsuit was filed? Well, they're different standards, Your Honor. Counsel reasonably concluded because they were not able to obtain medical records in the case of Mr. Jones that they would need to use the discovery process. And under Rule 11, you're permitted to make pleadings that you believe. I'm asking, are you aware of any case where a court said the clock started after a lawsuit was filed? No, Your Honor. And I think that gets to the exceptional circumstances in this case. The distinguishing factor here is that plaintiffs did not know they were ever exposed to the bear hugger, and they were acting diligently to try to find out if they were. That's what distinguishes this case from Taxipair and basically every other one, and shows why it's exceptional circumstances for the application of contra non volentem. They talk about the Taxipair case. Well, there they knew they had taken Taxipair. So, of course, that makes it reasonable in those facts to say once they learn of the connections, they could have done an inquiry sooner. Here they had no idea. The testimony was that the bear hugger was used, and then once it was, they acted diligently. A few record points that I want to get very clear. For Jones, with a commercial, it's in his deposition, the record at 201, he says the question, did the commercial actually mention bear hugger? Answer, no. So the commercial did not talk about bear hugger. Further, this notion that Jones had a lawyer on the phone in August of 2021, his testimony, which is in the record at 226, Mr. Jones said he didn't know whose lawyer that was. He said it could have been the lawyer for the health care company or his doctor. He had no knowledge. Once again, they're taking facts in light most favorable to them and saying that that was Mr. Jones' lawyer. There's no record evidence to support that. The fact that you hire a law firm that's been involved in a suit for five years does not mean that you have actual knowledge that the defendant acted tortiously against you. And for Mr. Pelican, I want to say, in there, they were able to get the records, thankfully, and they filed within a year of that. As mentioned, the unfiled claims, simply anyone who contacted counsel, not knowledge of actual device use. Seeing my time's expired, I would request that the court reverse infill. Thank you.